# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

    **v.**
                            **Case No. 2:23-cr-139**
                                   **JUDGE EDMUND A. SARGUS, JR.**

**ANTOINE DWAYNE RILEY,**

        **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Defendant Antoine Dwayne Riley's Motion to Suppress. (Mot., ECF No. 35.) The Government responded in opposition (Opp., ECF No. 42), and the Court held a hearing on Mr. Riley's Motion on November 3, 2023. For the reasons that follow, Mr. Riley's Motion is **DENIED.**

## I.      BACKGROUND

On November 13, 2022, at approximately 1:35 AM, officers with the Columbus Division of Police responded to a 911 call from Mr. Riley's mother, Debra Riley. (Mot., p.1; Opp., p.1.) Ms. Riley called 911 and reported that her son had assaulted her. (*Id.*) Kevin Kelley and Justin Weis were two of the Officers with the Columbus Police Division that responded to the scene. The Government submitted body camera video evidence[1] from the Officers and called both Officers to testify at the suppression hearing. (*See* DOMESTIC_VIOLENCE-3.mp4 ("Weis Cam."); KevinKelley_202211130314_VHC2022074_276449326.mp4 ("Kelley Cam.")).

---

[1] The Court relies on the video footage to resolve any factual disputes. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (establishing the high value of video footage in resolving factual disputes between the parties).

When the Officers first arrived, Mr. Riley had locked himself in an upstairs bedroom and refused to come out for over an hour. (Mot., p. 2.) Mr. Riley's upstairs bedroom was the entire second floor of the home. (*Id.*) While Mr. Riley was locked in the upstairs bedroom, Ms. Riley informed the Officers that she believed Mr. Riley may have a gun in his possession. (Opp., p. 1.)

Mr. Riley came down the stairs and surrendered at approximately 3:20:31 AM. (Weis Cam. 22:19-22:49; Kelley Cam. 06:59-07:05.) He was arrested at the foot of the steps. (*Id.*) Seconds later, Officer Weis and Officer Kelley, along with two other Officers, conducted a protective sweep of the upstairs bedroom.

The protective sweep began when the Officers climbed the stairs to clear the bedroom and Officer Kelley loudly stated, "Columbus Police, make yourself known." (Weis Cam. 22:19-22:39; Kelley Cam. 06:59-07:05.) Officer Weis was the first officer to arrive at the opening of a doorless closet in the bedroom, where the firearms were discovered seconds later. (Weis Cam. 22:39-22:48; Kelley Cam. 07:13-07:17.) At 3:21:33 AM, Officer Weis stated "clear, clear." (Weis Cam. 22:40-22:50; Kelley Cam. 07:20-07:24.) Two officers were in front of him, and Officer Kelley was located behind him near the closet. (*Id.*) At the suppression hearing, Mr. Riley argued the protective sweep should have ended at this moment. But Officer Weis testified that "clear, clear" could have been a question posed to the other Officers, asking whether the areas they were inspecting were cleared. Officer Kelley testified that "clear" does not necessarily communicate that the entire room was cleared, or that the protective sweep should stop.

Less than twenty seconds later (3:21:50 AM), Officer Kelley peered into a skinny open cardboard box at the front of the doorless closet and discovered a rifle loaded with one round of ammunition and a shotgun. (Kelley Cam. 07:38-08:00 (documenting the discovery of the firearms); Weis Cam., 1:03:00-1:07:00 (documenting the seizure of the firearms).) Officer

2

Kelley testified that it is a common practice for him to "double check" a particular area, like a closet, during a protective sweep to avoid mistakes and ensure officer safety. Which explained why he circled back to check the closet again after Officer Weis previously checked that area. When the Officers found the firearms, several of the Officers had lowered their weapons. (*See*, Weis Cam. 22:50-23:30; Kelley Cam. 07:24-07:58.) According to the Officers, they lowered their weapons to avoid pointing their weapons at the other Officers while they collectively searched a single bedroom with weapons drawn. After discovering the firearms, the Officers then went back downstairs and continued clearing the residence. (Weis Cam. 23:52-25:05; Kelley Cam. 08:26 -10:20.) The sweep ended approximately two minutes later. (*Id*.)

Later, Mr. Riley was indicted on one count of being a felon in possession of two firearms in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). (ECF No. 2.) In his Motion, he asserts that the firearms were seized during an unconstitutional search and seizure and should be suppressed as "fruit of the poisonous tree." (Mot., p. 7.) The Government argues that the firearms were in plain view and acquired during a constitutional protective sweep incident to Mr. Riley's arrest. (Opp., p. 4-5.)

## II.     FOURTH AMENDMENT ANALYSIS

A defendant may seek the suppression of evidence by filing a pretrial motion with the court. Fed. R. Crim. P. 12(b)(3)(C). "It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Patel*, 579 F. App'x 449, 453 (6th Cir. 2014) (citation omitted).

The Fourth Amendment protects "[t]he right of people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures . . ." U.S. Const. Amend.

3

IV. To preserve this right, evidence secured through an illegal search or seizure may not be used in a criminal proceeding. *Mapp v. Ohio*, 367 U.S. 643 (1961).

While warrantless searches and seizures are "*per se* unreasonable under the Fourth Amendment," that rule is subject to "a few specifically established well-delineated exceptions." *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). One such well-recognized exception to the warrant requirement is the plain view doctrine, which allows law enforcement to seize evidence in plain view without a warrant. *E.g.*, *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971). Four conditions must be present for the plain view exception to apply: (1) the object must be in plain view; (2) the officer must be legally present in the place from which the object can be plainly seen; (3) the object's incriminating nature must be immediately apparent; and (4) the officer must have a right of access to the object. *Horton v. California*, 496 U.S. 128, 137 (1990); *United States v. Carmack*, 426 F. App'x 378, 381-82 (6th Cir. 2011).

The Fourth Amendment authorizes law enforcement to conduct a limited protective sweep of the area where an at-home arrest occurs to ensure officer safety. *Maryland v. Buie*, 494 U.S. 325, 333 (1990). Specifically, "as a precautionary matter and without probable cause or reasonable suspicion, [officers can] look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334. The protective sweep may not, however, expand into a "full search of the premises" and is instead only a "cursory inspection" of the places where a person could be found. *Id.* at 335. The sweep may last "no longer than is necessary" to ensure officer safety, to dispel the reasonable suspicion of danger and to complete the arrest. *Id.* at 334-36.

Applying *Buie*, the Sixth Circuit has held that it is reasonable to search closets, under beds, and even between mattresses and box springs during a protective sweep. *E.g.*, *United States v. Lanier*, 285 F. App'x 239, 242 (6th Cir. 2008) (stating that "it is reasonable to search closets and under beds to ensure that no one was hiding there.") In *United States v. Cammon*, law enforcement arrested Cammon in the kitchen of his apartment and conducted a protective sweep of an adjoining bedroom. 849 F. App'x 541, 546 (6th Cir. 2021). During that protective sweep, officers found and seized two handguns and the Sixth Circuit held that seizure was permissible. *Id.* The first handgun found was "sticking up" from an open box in the bedroom's doorless closet and the second was seized from the space between the mattress and box spring of a bed. *Id.* While the Sixth Circuit noted that the seizure of the handgun from under the mattress was a "closer question," the *Cammon* Court held that the handgun seized from an open box in doorless closet was clearly permissible under the plain view exception. *Id.*

At the suppression hearing, Mr. Riley did not contest the Officers' right to conduct a protective sweep of the upstairs bedroom adjacent to his place of arrest. But he did, however, contest the Officers' right to seize the firearms under the plain view exception. (Mot., p. 6.) Mr. Riley argues that the protective sweep ended when Officer Weis stated "clear, clear" and the Officers lowered their weapons, indicating that the bedroom was secured from any individuals who may pose a danger to the Officers. (Mot., p. 6.) The reasonableness of a protective sweep, according to Mr. Riley, is not measured by its duration, but rather by when the Officers determined that no people were present in the bedroom who threatened their safety. Once the Officers determine no people were present, Mr. Riley argues the protective sweep should have ended. (*Id.*) Because the Officers stayed in the bedroom longer than was necessary to ensure

their safety, the Officers exceeded the permissible scope of a protective sweep, making the seizure of the firearms improper. (*Id*., p. 6-7.)

The Government argues that the protective sweep of the bedroom lasted no longer than was necessary to ensure the Officers' safety and complete the arrest. (Opp., p. 5.) Noting that it took the Officers only thirty-five seconds to locate the firearms, the Government submits that the Officers complied with the requirements of a protective sweep. The Government disagrees with Mr. Riley that the protective sweep ended when Officer Weis stated "clear, clear." According to Officer Kelley, "clear" does not necessarily communicate that the entire room was cleared or that the protective sweep should stop. The fact that the Officers lowered their weapons also did not prove the protective sweep ended, but only shows that the Officers were avoiding potential safety risks associated with four officers searching a single bedroom with guns drawn.

The Court finds the testimony of Officer Weis and Officer Kelley credible. The Officers were in the bedroom no longer than was necessary to complete the arrest and dispel any reasonable suspicions of danger. The protective sweep of the bedroom lasted less than a minute, and the entire protective sweep of the house lasted under three minutes. (Kelley Cam. 08:26 - 10:20.) A protective sweep of less than one minute is not longer than necessary and is constitutionally permissible. *See Thomas v. City of Columbus*, No. 2:15-cv-2469, 2017 U.S. Dist. LEXIS 153371, at *35 (S.D. Ohio Sep. 20, 2017) (holding that a protective sweep lasting less than one minute immediately after the defendant was taken into custody was permissible); *United States v. King*, 382 F. Supp. 3d 702, 709 (N.D. Ohio 2019) (finding a protective sweep of less than two minutes was fairly limited in duration and reasonable and thus did not taint the defendant's consent to the home search). Likewise, this Court finds the duration of the protective

sweep was not "longer than necessary" and the Officers did not exceed the permissible scope of the protective sweep.

Accordingly, the Officers were lawfully present in the bedroom where the firearms were plainly seen in an open cardboard box in a closet without doors. *See Cammon*, 849 F. App'x at 546 (finding seizure of a gun sticking up from an open box in doorless closet permissible under the plain view exception). The seizure of the two firearms was constitutional under the Fourth Amendment. In the absence of a constitutional violation, Mr. Riley has failed to meet his burden to justify the suppression of the firearms. *See United States v. Patel*, 579 F. App'x at 453.

### III.     CONCLUSION

 For the foregoing reasons, Mr. Riley's Motion to Suppress Evidence (ECF No. 35) is **DENIED**.

**IT IS SO ORDERED.**

<u>11/6/2023</u>                                       <u>s/Edmund A. Sargus, Jr.</u>
**DATE**                                              **EDMUND A. SARGUS, JR.**
                                                      **UNITED STATES DISTRICT JUDGE**